**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| RUSSELL CICHY, | |
| *Plaintiff*, | |
| v. | |
| BASF CORPORATION, COSMED GROUP, INC., ISOMEDIX OPERATIONS, INC., and PPG INDUSTRIES, INC., | |
| *Defendants*, | |
| and | |
| MEDLINE INDUSTRIES, INC., MEDLINE INDUSTRIES, L.P., VANTAGE SPECIALTY CHEMICALS, INC., CHARLES N. MILLS, and JAMES D. ABRAMS, | Civil Action No. 24-cv-06248 |
| *Nominal Defendants*. | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant PPG Industries, Inc. ("PPG") files this notice of removal based on diversity jurisdiction and makes the following statement of the grounds for removal.

### SUMMARY OF THE NOTICE

Plaintiff recently announced binding, global settlements with Vantage Specialty Chemicals, Inc. ("Vantage"), Medline Industries, Inc. ("Medline Inc."), Medline Industries, L.P. ("Medline L.P."), Charles N. Mills, and James D. Abrams, and the state court for the first time last week declared them nominal defendants. Complete diversity therefore exists between Plaintiff and all remaining defendants. Since the amount in controversy exceeds $75,000, diversity jurisdiction exists.

1

Further, this case is timely removed. It was filed only on May 8, 2024, and PPG has not yet been served.

## PROCEDURAL HISTORY

1. On May 8, 2024, Plaintiff filed a Complaint and Demand for Jury Trial (the "Complaint") styled *Cichy v. PPG Industries, Inc., et al.*, No. 2024L005112, in the Circuit Court of Cook County, Illinois, County Department, Law Division (the "State Action").

2. Plaintiff has asserted causes of action for negligence, willful and wanton conduct, public nuisance, and ultrahazardous activity. Plaintiff is seeking monetary damages.

## THIS CASE IS PROPERLY REMOVED TO THIS COURT

**I.    This Court has diversity jurisdiction.**

**A.    Complete diversity of citizenship exists.**

3. Under 28 U.S.C. § 1332(a)(1), this is a civil action between "citizens of different states."

4. Plaintiff is alleged to be an individual who is a citizen of Illinois.

**1.    Defendants whose citizenship counts for diversity purposes.**

5. PPG is a Pennsylvania corporation with its principal place of business in Pennsylvania. PPG is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

6. BASF Corporation ("BASF") is a Delaware corporation with its principal place of business in New Jersey. BASF is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

7. Cosmed Group, Inc. ("Cosmed") is a Delaware corporation with its principal place of business in Rhode Island. Cosmed is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

8.      Isomedix Operations, Inc. ("Isomedix") is a Delaware corporation with its principal place of business in Ohio. Isomedix is not a citizen of the state where the action is brought. *See* 28 U.S.C. §§ 1332(a), 1441(b).

### 2.      Nominal defendants whose citizenship does not count for diversity purposes.

9.      Vantage, Medline Inc., Medline L.P., Mr. Mills, and Mr. Abrams are nominal defendants because they reached binding, global settlements with Plaintiff in the State Action. As stated by the state court during a July 17, 2024, conference:

> are -- there have been, but this Court certainly considers Vantage and Medline to be nominal defendants only and named only. They're solely here for purposes of the settlements.

10.     "[S]ettled defendants" are "merely nominal parties," and therefore their presence "is disregarded for removal purposes." *Pulse Eng'g, Inc. v. Fed. Ins. Co.*, No. 06-1237, 2006 WL 6557899, at *3 (S.D. Ind. Dec. 5, 2006).

11.     On June 25, 2024, Plaintiff in the State Action filed a Motion to Vacate Trial Date that for the first time disclosed that "Plaintiffs' counsel and Vantage Specialty Chemicals, Inc. ('Vantage') have just recently reached a landmark settlement that stands to resolve the hundreds of claims alleged against Vantage." Vantage is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[1]

---

[1] Upon information and belief, Vantage is a Delaware corporation with a principal place of business in Illinois.

12.     On July 2, 2024, Plaintiff in the State Action filed a Motion to Appoint Cathy Yanni of JAMS as Allocation Neutral of the Medline Settlement that for the first time disclosed that "Defendant Medline Industries, Inc. and Medline Industries, L.P. (together 'Medline') and Plaintiffs' Counsel Edelson PC recently entered into a binding settlement." Medline Inc. is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[2]

13.     Plaintiff's claims against Medline L.P. are subject to the global settlement with Medline Inc., referenced above. Medline L.P. is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[3]

14.     Mr. Mills is the former Chief Executive Officer of Medline Inc. Plaintiff's claims against him are subject to the global settlement with Medline Inc., referenced above. Mr. Mills is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[4]

15.     Mr. Abrams is the former Chief Operating Officer of Medline Inc. Plaintiff's claims against him are subject to the global settlement with Medline Inc., referenced above. Mr. Abrams is therefore a settled defendant and a nominal party whose presence is disregarded for removal purposes.[5]

*        *        *

---

[2] Upon information and belief, Medline Inc. is a Delaware corporation with a principal place of business in Illinois.

[3] Upon information and belief, at least one of Medline L.P.'s members is an Illinois citizen.

[4] Upon information and belief, Mr. Mills is a citizen of Illinois.

[5] Upon information and belief, Mr. Abrams is a citizen of Illinois.

16.     Therefore, at the time of removal, there is complete diversity between Plaintiff and all remaining defendants because the only remaining defendants in this case are citizens of different states from Plaintiff under 28 U.S.C. § 1332(a)(1).

17.     Likewise, 28 U.S.C. § 1441(b)(2) does not preclude removal because none of the joined and served remaining defendants are citizens of the forum state.

**B.      The amount in controversy exceeds $75,000.**

18.     The amount in controversy in this matter exceeds $75,000.

19.     For each of his asserted claims, Plaintiff seeks to recover an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois, which is $30,000. Accordingly, Plaintiff seeks a minimum of $120,000 and removal is proper. *See* 28 U.S.C. § 1332(a).

20.     The amount in controversy for Plaintiff's claims can be aggregated under applicable state law because he may seek to hold defendants jointly and severally liable for their alleged conduct. *See* 735 ILCS 5/2-1117; 735 ILCS 5/2-1118; *accord Am. Standard Ins. Co. v. Rogers*, 123 F. Supp. 2d 461, 466 (S.D. Ind. 2000).

**II.      PPG timely filed this notice of removal.**

21.     Plaintiff has yet to serve PPG in the State Action. Therefore, under 28 U.S.C. § 1446(b)(1), this Notice of Removal is being filed within 30 days after PPG was served in the State Action and is timely filed.

**III.      This Court is the appropriate venue for removal.**

22.     Removal is proper to this District and this division because the Eastern Division of the Northern District of Illinois is the district and division within which the State Action is pending. 28 U.S.C. § 1441(a).

IV.     **All joined and served remaining defendants consent to removal.**

23.     PPG files this notice of removal.

24.     BASF has not been served in this action such that its consent is not required. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring that only defendants properly joined *and* served must consent to removal (emphasis added)).

25.     Cosmed consents to removal.

26.     Isomedix consents to removal.

27.     Since they are nominal, settled defendants, Vantage, Medline Inc., Medline L.P., Mr. Mills, and Mr. Abrams's consent to removal is not required. *Estate of Pilsnik v. Hudler*, 118 F. Supp. 2d 905, 908 (E.D. Wisc. 2000) ("Even if Mr. Hurdler is seen as a defendant, he is only a nominal defendant whose consent is not required for removal.").

## CONCLUSION

28.     Based on the above, this action is removable to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

29.     Pursuant to 28 U.S.C. § 1446(a), a copy of all "process, pleadings, and orders previously served on" PPG and Plaintiff's original complaint are attached to this Notice of Removal. *See DiNello v. U.S. Dep't of Ed.*, No. 06-2763, 2006 WL 3783010, at *1 n.1 (N.D. Ill. Dec. 21, 2006) (Hart, J.).

30.     In accordance with 28 U.S.C. § 1446(d), PPG will promptly provide written notice of removal of the State Action to Plaintiff and will promptly file a copy of this Notice of Removal with the Clerk of the Circuit Court of Cook County, Illinois.

31.     PPG's Rule 7.1 Corporate Disclosure Statement and Local Rule 3.2 Notification as to Affiliates Statement will be filed promptly following this Notice of Removal.

32.     If any question arises as to the propriety of the removal of this action, PPG requests the opportunity to present a brief with supporting documentation, if applicable, and oral argument in support of its position that this case is removable.

33.     By filing this notice of removal, PPG does not waive and hereby expressly reserves the right to assert any defense or motion available in this action pursuant to state or federal law after removal to this Court, including, but not limited to, objections regarding jurisdiction, venue, sufficiency of process or service of process, and the service of discovery.

WHEREFORE, PPG respectfully removes this action from the Circuit Court of Cook County, Illinois, County Department, Law Division to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

Respectfully submitted,

**PPG INDUSTRIES, INC.**

By */s/ Kenn Brotman*
     Vincenzo R. Chimera #6320435
     Kenn Brotman #6236771
     **K&L GATES LLP** - #45515
     70 West Madison Street, Suite 3100
     Chicago, IL 60602
     Telephone: (312) 807-4200
     Email: vincenzo.chimera@klgates.com
     Email: kenn.brotman@klgates.com

     David A. Fusco *Pro Hac Vice Forthcoming*
     david.fusco@klgates.com
     Wesley A. Prichard *Pro Hac Vice Forthcoming*
     wesley.prichard@klgates.com
     K&L GATES LLP
     K&L Gates Center
     210 Sixth Avenue
     Pittsburgh, Pennsylvania 15222
     Telephone: (412) 355-6500
     Facsimile: (412) 355-6501

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 24, 2024, a true and correct copy of the foregoing document was served upon all known counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Kenn Brotman*
Kenn Brotman

# **Exhibit 1**

Law Division Motion Section Initial Case Management Dates for 12-CERTURAX (W,B/Q/S,Z,T,K,X,Z) will be heard in-person
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 7/16/2024 9:30 AM

FILED
5/8/2024 7:06 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L005112
Calendar, C
27613513

FILED DATE: 5/8/2024 7:06 PM  2024L005112

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

RUSSELL CICHY,

*Plaintiff,*

v.

MEDLINE INDUSTRIES, INC., MEDLINE INDUSTRIES, L.P., CHARLES N. ("CHARLIE") MILLS, JAMES D. ("JIM") ABRAMS, ISOMEDIX OPERATIONS, INC., COSMED GROUP, INC., VANTAGE SPECIALTY CHEMICALS, INC., BASF CORPORATION, and PPG INDUSTRIES, INC.,

*Defendants.*

No.

**PLAINTIFF DEMANDS TRIAL BY JURY**

*In Re: Medline ETO Release*

Consolidated with 2023-L-000686 (previously 2019-L-009502) for pre-trial and discovery purposes.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Russell Cichy brings this Complaint and Demand for Jury Trial against Defendants Medline Industries, Inc. and Medline Industries, L.P. (collectively "Medline"), Charles N. ("Charlie") Mills, James D. ("Jim") Abrams, Isomedix Operations, Inc. ("Isomedix"), Cosmed Group, Inc. ("Cosmed"), Vantage Specialty Chemicals, Inc. ("Vantage"), BASF Corporation ("BASF"), and PPG Industries, Inc. ("PPG") (together "Defendants"), for causing Mr. Cichy to develop cancer. Plaintiff alleges that Defendants negligently polluted the air in his neighborhood with large amounts of ethylene oxide ("EtO"), a colorless and odorless but highly carcinogenic gas. Plaintiff further alleges that these carcinogenic EtO emissions caused his cancer. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters upon information and belief.

FILED DATE: 5/8/2024 7:06 PM   2024L005112

## INTRODUCTION

### I.     Medline and the Mills/Abrams Family

1.      Valued at $34 billion, Medline is one of the largest private corporations in the world. Until recently, Medline operated as a closely held family corporation, with a tight-knit group of family members including Charlie Mills (CEO), his brother Andy Mills (President), their sister Wendy Abrams, nee Mills (Principal and former Head of Corporate Communications), and Wendy's husband Jim Abrams (COO) (altogether the "Mills/Abrams Family") owning substantially all of the company and serving in substantially all top-level leadership roles.

2.      The Mills/Abrams Family have long operated Medline with an iron grip, making substantially all significant decisions related to the management not just of Medline generally, but also related to the management of the Waukegan Sterilization Facility and Libertyville Warehouse, specifically. On information and belief, with respect to the tortious conduct described throughout this complaint that is relevant to Medline, defendants Charlie Mills and Jim Abrams personally lead, participated in, and took part in such conduct.

3.      One aspect of the Mills/Abrams Family's iron grip management style—one which they have long been lauded for—is their "devotion to tight cost management." *See* Devon Pendleton, *Chicago Family Poised for $29 Billion Windfall After Record Buyout*, Bloomberg, (Dec. 3, 2021), https://tinyurl.com/4p6cpzfa.

4.      That approach to business has proven wildly lucrative for the Mills/Abrams Family: while the Sacklers are perhaps the most widely recognized billionaire family in the medical industry, with a combined net worth of approximately $11 billion, the Mills/Abrams Family's recent sale of Medline netted the family approximately $30 billion, placing the family amongst the wealthiest in the world. *See id.*

FILED DATE: 5/8/2024 7:06 PM    2024L005112

5.    Discovery recently produced in this case has revealed that the Mills/Abrams Family's devotion to "tight cost management" applied with full force to their management of ethylene oxide pollution controls. Specifically, though Medline is worth some $34 billion,



Charlie Mills and Jim Abrams. *See, e.g.*, MEDLINE00492719, attached hereto as **Exhibit 1** ("

"). So, for example, when in

after operating the Waukegan Sterilization Facility              —Medline

Charlie Mills and Jim Abrams. *See* MEDLINE00268725, attached hereto as **Exhibit 2** ("

").

6.    While a devotion to tight cost management may be praiseworthy in many lines of business, it's quite the opposite when one's business requires using enormous volumes of a highly carcinogenic gas. And it's downright catastrophic when one's business requires doing so in the midst of a dense urban environment like Waukegan, Illinois.

7.    As one example (among many) of the problems with operating an EtO sterilizer with a "devotion to tight cost management," Charlie Mills and Jim Abrams

until it was far too late for Mr. Cichy, whose cancer was caused by Medline's excessive EtO pollution at the Waukegan Sterilization Facility.

FILED DATE: 5/8/2024 7:06 PM   2024L005112

## II.    Medline, Isomedix, Cosmed, BASF, PPG, and Vantage

8.      Defendants are industrial users and polluters of ethylene oxide gas in Illinois. Medline, Isomedix, and Cosmed are industrial medical device sterilizers and BASF, PPG, and Vantage are chemical producers.

9.      While ethylene oxide ("EtO") has been classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since at least the mid-1980s, Medline, Isomedix, Cosmed, BASF, PPG, and Vantage disregarded ethylene oxide's harmful properties and continued to release it into the surrounding suburban communities—until recently entirely unbeknownst to area residents and workers.

10.     Self-reported emission estimates from these facilities reflect high levels of ethylene oxide release. The combined ethylene oxide emissions from these facilities have reached as high as 13,000 pounds per year. While some EtO emissions are from controlled sources, the majority of these emission estimates are "fugitive emissions" that escape the facilities as they use EtO.

11.     Initial air monitoring tests commissioned by the Lake County Health Department, the Village of Gurnee, and the City of Waukegan demonstrated to the public the widespread nature of the ethylene oxide pollution taking place. The tests show the presence of toxic ethylene oxide gas as far as 4.8 miles from the Waukegan facility and 4 miles from the Gurnee facility, much further than previously suspected.

12.     As a result, individuals living and working near these EtO-emitting facilities face some of the highest long-term cancer risks in the United States. These individuals have been inhaling ethylene oxide on a routine basis for decades. Now they are suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from their regular exposure to ethylene oxide.

FILED DATE: 5/8/2024 7:06 PM 2024L005112

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, maintain facilities in Illinois, and/or have committed tortious acts in Illinois.

14.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because several Defendants, including Medline and Vantage, maintain offices in Cook County, are each headquartered in Cook County, and conduct business in Cook County.

## THE PARTIES

15.     Plaintiff Russell Cichy is a natural person and a resident of the State of Illinois.

16.     Defendant Vantage Specialty Chemicals, Inc. and its predecessors have operated and continue to operate a chemical production facility in Gurnee, Illinois since at least 2003 (the "Gurnee Facility"). Vantage Specialty Chemicals, Inc. is a privately-held company headquartered at 4650 South Racine Avenue in Chicago, Cook County Illinois. Defendant is authorized to transact business in this county and is doing business in this county.

17.     Defendant BASF Corporation operated the chemical production facility in Gurnee, Illinois from 1997 to 2003. BASF is a publicly-held company headquartered at 100 Campus Drive, Florham Park in New Jersey. Defendant was authorized to transact business in this county and did business in this county.

18.     Defendant PPG Industries, Inc., acquired the chemical production facility in Gurnee, Illinois in 1987, and operated the facility from 1987 through 1996. Defendant PPG Industries, Inc., is a publicly-held company headquartered at One PPG Place in Pittsburgh, Pennsylvania.

19.     Defendant Medline operates a sterilization facility in Waukegan, Illinois (the "Waukegan Facility"). Medline is a privately-held company headquartered at 3 Lakes Drive,

5

FILED DATE: 5/8/2024 7:06 PM   2024L005112

Northfield, Cook County, Illinois. Defendant is authorized to transact business in this county and is doing business in this county.

20.     Defendants Charlie Mills and Jim Abrams are natural persons and citizens of the State of Illinois.

21.     Defendant Isomedix Operations, Inc.'s predecessors operated the Waukegan Facility between January 2005 to September 2008. Isomedix is a privately held corporation headquartered at 5960 Heisley Road, Mentor, Ohio 44060. On January 1, 2015, Steris Isomedix Services Inc. merged with and into Isomedix Operations, Inc., a wholly owned subsidiary of Steris Corporation, with Isomedix Operations, Inc. surviving the merger. Isomedix Operations, Inc. is the successor to Steris Isomedix Services Inc., which no longer exists as a legal entity.

22.     Defendant Cosmed Group, Inc. operated the Waukegan Facility prior to 2005. Cosmed is a privately-held corporation headquartered at 28 Narragansett Avenue, Jamestown, Rhode Island, 02835.

## COMMON FACTUAL ALLEGATIONS

### I.    Brief Overview of the Ethylene Oxide Industry

23.     Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial uses. There are two primary known industrial uses for ethylene oxide at Defendants' facilities: medical equipment sterilization and chemical production.

24.     Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment.

25. Concerning chemical production, EtO undergoes a chemical reaction to create new chemical compounds. Ethylene glycol is one of the most common chemicals synthesized from ethylene oxide and is often used in a wide range of products such as polyester fibers (for use in clothing, carpets, and upholstery), industrial coolants, antifreeze, and personal care products such as cosmetics, shampoos, body washes, and other skincare products.

26. Defendants use and/or have used ethylene oxide in their industrial processes. Between approximately 1993 and 2005, Cosmed operated the Waukegan Facility, which used EtO for industrial medical device sterilization, until Isomedix took over the facility in 2005. Isomedix operated the Waukegan Facility, which used EtO for industrial medical device sterilization, from January 2005 until 2008 when Medline ultimately took over the facility. Since 2008, Medline has used and continues to use EtO for medical device sterilization at the Waukegan Facility. BASF, PPG, Vantage, and their predecessors have used, and Vantage continues to use, EtO in chemical production at its Gurnee facility since at least 1987.

27. Throughout the industrial processes described above, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

28. Through their processes, these plants emitted (and Medline and Vantage continue to emit) EtO into the air, allowing it to disperse and be carried by wind throughout the area surrounding the facilities. Indeed, Lake County recently conducted EtO air monitoring tests, discussed below, demonstrating that EtO emissions have traveled as far as 4.8 miles from the Waukegan Facility and 4 miles from the Gurnee Facility.

FILED DATE: 5/8/2024 7:06 PM 2024L005112

29.     As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades. All Defendants knew, or should have known, EtO to be dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.     Health Effects of Ethylene Oxide Exposure

30.     Ethylene oxide is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known in the industries that use it for decades.

31.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised a concern about potential carcinogenicity of ethylene oxide.

32.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased number of leukemia and other cancers.

33.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials containing

FILED DATE: 5/8/2024 7:06 PM    2024L005112

ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

34.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

35.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at 14 different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

36.     As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the U.S. Environmental Protection Agency's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by 30 times. Critically, these classifications are not limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a

FILED DATE: 5/8/2024 7:06 PM    2024L005112

toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

37.    Exposure to ethylene oxide has been widely studied and its negative health effects are well documented. Presently, there is evidence linking ethylene oxide exposure to increased risk of lymphohematopoietic cancer such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including increased rate of miscarriages and infertility.

38.    Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding the Sterigenics facility in Willowbrook, Illinois that has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirmed the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;
- Pediatric lymphoma;
- Breast cancer;
- Prostate cancer;
- Pancreatic cancer;
- Ovarian cancer; and
- Bladder cancer.

39.    Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. Environmental Protection Agency ("U.S. EPA") states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

III.    **Defendants Knew For Decades That EtO Emissions Were Harmful**

FILED DATE: 5/8/2024 7:06 PM    2024L005112

40.     By the early 1980s (at the latest), ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. This means that, by the time each Defendant operated its facility—starting with PPG in at least 1987—it knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

41.     In 1981, the National Institute for Occupational Safety and Health ("NIOSH") published a "current intelligence bulletin" recommending that EtO "be regarded in the workplace as a potential occupational carcinogen, and that appropriate controls be used to reduce worker exposure. That bulletin was widely circulated amongst all industrial users of EtO, with one prominent EtO sterilizer, Sterigenics, circulating an internal memorandum describing the bulletin as "another nail in the coffin" of EtO sterilization.

42.     In October 1985, the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's carcinogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional 47 cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to occur."

43.     In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This

11

FILED DATE: 5/8/2024 7:06 PM   2024L005112

request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986 letter to various EtO users and emitters, including Medline Industries. Ultimately, ethylene oxide was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

44.     By 1990 then, ethylene oxide users and emitters were well aware of the dangers of the chemical and legal consequences of emissions. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of ethylene oxide alleging that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

45.     The Defendants in this action, however, continued to emit large quantities of ethylene oxide (as discussed below) notwithstanding these known dangers. Cosmed Group, for example, agreed to pay $1.5 million in 2005 for Clean Air Act violations arising from six of its eight facilities, including the Waukegan Facility. According to the U.S. EPA, Cosmed's "violations are thought to have occurred from at least 1998 until 2003" for its 30 tons of *excess* emissions across three facilities combined, including its Waukegan Facility. This violation led Cosmed to sell the Waukegan Facility to Defendant Isomedix. On information and belief, Defendant Isomedix was aware of the previous Clean Air Act violations at the Waukegan Facility at the time it purchased that facility from Defendant Cosmed Group.

46.     Prior to taking over the Waukegan Facility, Isomedix merged with American Sterilizer Company ("AMSCO") which had itself already been subject to multiple product liability lawsuits related to EtO. Isomedix's SEC filings state that "[a]s of December 31, 1996, 11 product liability lawsuits related to AMSCO ethylene oxide ("EtO") sterilizers were pending." Many of

12

FILED DATE: 5/8/2024 7:06 PM    2024L005112

the product liability lawsuits alleged that AMSCO was responsible for the plaintiffs' personal injuries resulting from toxic exposure to EtO.

47.     In 1996, the U.S. EPA issued its first model of EtO exposure concentrations for areas surrounding emitters. The 1996 model revealed that Lake County, Illinois residents had significantly greater EtO concentration exposure (0.0085 µg/m$^3$) than the national average (0.00295 µg/m$^3$), or over 2.8 times the average nationwide concentration. The 95th percentile of modeled ethylene oxide exposure in Lake County (0.02176 µg/m$^3$) was also *double* that of the national 95th percentile (0.01051µg/m$^3$) of human exposure concentration.

48.     The U.S. EPA repeated its exposure concentration modeling by using reported emissions from 1999. The 1999 air modeling revealed that Lake County residents are at an increased risk of cancer from ethylene oxide and had a risk greater than 1.5 times the national cancer risk from ethylene oxide exposure.

49.     Thus, the potential dangers EtO emissions posed to nearby residents was known, or should have been known, to the Defendants by the time they operated their facilities, and years in advance of the Plaintiff's diagnosis.

## IV.     Lake County Facilities Emit Harmful Ethylene Oxide

### a.     The U.S. EPA Estimates High Risks of Cancer in Lake County

50.     On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA"). The NATA is a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States.

51.     The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than what the U.S. EPA considers "acceptable" limits: 100 cases for every 1 million people exposed to toxic air pollution during their lifetime. Of the 109 census tracts, the 2014

FILED DATE: 5/8/2024 7:06 PM    2024L005112

NATA identified four tracts in northern Illinois as having potential cancer risks of 100 in 1 million or greater from exposure to air toxics:

- Tract 17097862605/8626.05 (1.1 mi² near Waukegan, Park City): **157 per million**;

- Tract 17097862800/8628.00 (1.2 mi² near Waukegan, North Chicago): **131 per million**;

- Tract 17097861504/8615.04 (2.8 mi² near Gurnee, Park City): **123 per million**; and

- Tract 17097862604/8626.04 (1 mi² near Waukegan, Park City): **100 per million**.

52.     The U.S. EPA released a statement that it believes that "largest sources of ethylene oxide emissions in Lake County are Medline, a commercial sterilizer located in Waukegan, and Vantage, a chemical production facility in Gurnee."

53.     The U.S. EPA estimates the lifetime risk of developing cancer due to air toxics in one of these four Lake County tracts near the Waukegan Facility and Gurnee Facility to be up to five times higher than average the national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the United States have an estimated cancer risk due to air toxics of greater than or equal to 100 in one million.

**b.     The U.S. EPA's Cancer Risk Assessments are Understated**

54.     While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Waukegan and Gurnee Facilities, these risks are understated.

55.     The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate the emission sources and potential public health risks. It notes several NATA shortcomings such as the lack of direct measurements of pollutants and data gaps.

56.     The lifetime risk of developing cancer in the aforementioned census tracts is likely significantly higher than what the U.S. EPA estimated in the 2014 NATA. That is because Vantage's 2014 EtO emissions were actually *omitted* from the 2014 NATA. According to the U.S.

14

FILED DATE: 5/8/2024 7:06 PM 2024L005112

EPA, this was due to a clerical "error" in the National Emissions Inventory which caused Vantage's 2014 EtO emissions to be calculated as zero for purposes of the 2014 NATA.[1] That is, the finding that cancer risk levels were up to five times the national average were based on the assumption that Vantage did not emit a single pound of EtO in 2014. Adding in the thousands of pounds that Vantage actually emitted would only result in ever higher cancer risk levels for the areas surrounding the plant. In short, without the Vantage emissions in its calculations, the cancer risks identified in the 2014 NATA for people living and working in the area were and continue to be dramatically underestimated.

57.     Most importantly, the 2014 NATA is only a model created on an assumed exposure to a facility's reported emissions from a single year: 2014. But the emissions from the Gurnee Facility and Waukegan Facility have historically been much higher than their reported emissions in 2014.

58.     The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals which pose a threat to human health and the environment.

59.     A review of TRI data from the U.S. EPA shows EtO emissions from the Gurnee Facility over the past three plus decades, with a prominent increase of emissions beginning in 2010.

_See_ Figure 1.

---

[1]     https://www.epa.gov/il/ethylene-oxide-emissions-lake-county-illinois#vantage

FILED DATE: 5/8/2024 7:06 PM 2024L005112



**(Figure 1.)**

60.     While Vantage ultimately reported 2,723 pounds of EtO emissions in 2014, that figure is overshadowed by its nearly 20,000 pounds emissions of EtO during a two-year period in 2010 and 2011. Similarly, Vantage reports emitting EtO in smaller, albeit significant quantities throughout the years:

- 2010: 9,649 pounds
- 2011: 9,709 pounds
- 2012: 3,425 pounds
- 2013: 2,832 pounds

- 2014: 2,723 pounds
- 2015: 1,277 pounds
- 2016: 1,127 pounds
- 2017: 1,547 pounds

61.     It is important to note that majority of Vantage's reported total emissions, as shown above, are the result of estimated "fugitive" emissions. To illustrate, Vantage's fugitive emissions constituted more than 80% of its total emissions in 2010 and 2011. In 2010, Vantage reported 9,649 pounds of total EtO emissions with 8,073 pounds of fugitive emissions and in 2011 Vantage reported 9,709 pounds of total EtO emissions with 7,984 pounds of fugitive emissions. Vantage's fugitive EtO emissions constitute a significant portion of its total emissions:

- 2010: 8,073 pounds
- 2011: 7,984 pounds
- 2012: 2,704 pounds
- 2013: 2,110 pounds

- 2014: 2,003 pounds
- 2015: 551 pounds
- 2016: 414 pounds
- 2017: 810 pounds

16

FILED DATE: 5/8/2024 7:06 PM 2024L005112

62. Because of the elusive nature of these fugitive emissions, they are difficult to calculate, and are likely an underestimation. In fact, Vantage entered into a compliance agreement with the Illinois EPA regarding allegations that Vantage failed to test and maintain EtO-filtration equipment—which may have failed to achieve the required reduction in overall uncontrolled EtO emissions—in 2016.

63. And although Vantage reported reductions in emissions after 2012, the facility's self-reported regulatory data is difficult to independently verify. For example, Vantage reported to another office at the U.S. EPA that during 2014 it released 6,412 pounds of EtO—**not 2,723 pounds as has been recently reported to the U.S. EPA.**

64. Unfortunately, none of these emissions were used in calculating the cancer risks in the 2014 NATA, as mentioned above.

65. The U.S. EPA's TRI data shows that emissions from the Waukegan Facility consistently exceeded 4,000 pounds of EtO between 1996 and 2001, including approximately 17,000 pounds between 1999 and 2001.

*See* Figure 2.



**(Figure 2.)**

FILED DATE: 5/8/2024 7:06 PM 2024L005112

66. The TRI data does not display any emissions from the Waukegan Facility after 2005. Nonetheless, according to self-reported emissions data submitted to the Illinois EPA, the Waukegan Facility reported significant EtO emissions:

- 2006: 5,484 pounds
- 2007: 4,980 pounds
- 2008: 3,297 pounds
- 2009: 3,784 pounds
- 2010: 3,750 pounds
- 2011: 3,437 pounds

- 2012: 3,512 pounds
- 2013: 3,069 pounds
- 2014: 3,526 pounds
- 2015: 3,115 pounds
- 2016: 2,993 pounds
- 2017: 2,863 pounds

67. These self-reported emissions to the Illinois EPA from the Waukegan Facility are *only* controlled emissions and do not include any estimates for fugitive emissions whatsoever.

68. While all Defendants have been knowingly releasing EtO for decades, people living and working in the surrounding community were unaware that the Defendants routinely exposed them to a dangerous, toxic, carcinogenic, and mutagenic gas.

c. **Lake County Begins Air Monitoring**

69. On August 21, 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released a report of health risks related to the chemical release of EtO by Sterigenics, a commercial sterilizer 40 miles southwest in Willowbrook, Illinois. The ATSDR concluded that an elevated cancer risk existed for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility due to EtO.

70. In the following months, Lake County officials, health departments, state and national elected representatives, and concerned residents repeatedly pleaded with the U.S. EPA and Illinois Environmental Protection Agency ("IEPA") to conduct ambient air monitoring surrounding the Waukegan and Gurnee Facilities. Despite these requests, the U.S. EPA and IEPA

18

refused to conduct ambient air monitoring anywhere in Lake County, much less near the Waukegan and Gurnee Facilities.

71.     Finally, on May 20, 2019, local community officials approved an intergovernmental agreement between the Village of Gurnee, City of Waukegan, and Lake County to conduct air monitoring.

72.     The air monitoring began on June 3, 2019 by placing cannisters at four sites near Medline, four sites near Vantage, and two remote locations in Lake County. The Lake County Health Department released partial test results on June 21, 2019 that revealed the presence of EtO in almost every sample. The test results also showed the presence of EtO as far as 4.5 miles from the Waukegan Facility and 4 miles from the Gurnee Facility. The air monitoring cannisters surrounding the Waukegan and Gurnee Facilities registered elevated levels of EtO with the highest twenty-four hour reading at ten micrograms of ethylene oxide per cubic meter of air (10 ug/m$^3$).

73.     For reference, the U.S. EPA associates a concentration of ethylene oxide of 0.02 ug/m$^3$ with a 100-in-a-million cancer risk for a lifetime of exposure. The highest recorded EtO concentration surrounding the Waukegan and Gurnee Facilities corresponds with a cancer risk as high as 500 times the EPA's 100-in-a-million cancer risk.

74.     On November 26, 2019 the Lake County Health Department received the first set of air monitoring test results from the second phase of air testing that took place between October 26, 2019 and November 2, 2019.

75.     Air test results confirm the June 2019 findings. That is, ethylene oxide has been detected in high concentration in communities around the Waukegan and Gurnee Facilities, and in remote locations away from both facilities.

76.     Lake County's final phase of air monitoring started in April 2020 and after Medline supposedly installed new air emission controls. The air monitoring canisters registered EtO levels

19

FILED DATE: 5/8/2024 7:06 PM   2024L005112

over 53 times the EPA's 100-in-a-million cancer risk in remote locations and as high as 0.92 μg/m³ near Medline—representing EtO levels 43 times the EPA's 100-in-a-million cancer risk—and as high as 5.49 μg/m³ near Vantage—representing EtO levels over 274 times the EPA's 100-in-a-million cancer risk.

77.     The full extent of EtO emissions throughout Lake County was unknown to those living and working in the area until Lake County released the air monitoring test results. Indeed, the local air monitoring tests revealed a more accurate picture of EtO concentrations and the distance EtO has traveled than the U.S. EPA's NATA report. And the air monitoring tests revealed areas in Lake County with high EtO concentrations that were previously not indicated by the 2014 NATA report.

78.     Even still, the full health impact on those who live and work near the Waukegan and Gurnee Facilities is still not entirely known. The Lake County Health Department has requested that the Illinois Department of Public Health conduct a cancer incidence assessment in Lake County.

## **FACTS SPECIFIC TO RUSSELL CICHY**

79.     Plaintiff Russell Cichy has been a resident of the Lake County area since around 2004. From around 2004 to the present, he has lived approximately 1.3 miles from the Gurnee Facility and approximately 2.3 miles from the Waukegan Facility. From around 2004 to the present, he has worked approximately 1.3 miles from the Gurnee Facility and approximately 2.3 miles from the Waukegan Facility.

80.     Plaintiff consistently inhaled contaminated air in and around his home, his work, and in the Lake County area.

81.     Because of his inhalation of EtO from Defendants' facilities, Plaintiff was recently diagnosed with cancer in 2022.

FILED DATE: 5/8/2024 7:06 PM    2024L005112

82.     Plaintiff, having exercised reasonable diligence, first learned that Plaintiff's injury was wrongfully caused on a date less than two years prior to the filing of this complaint.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and Against Defendants)**

83.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84.     At all times relevant, Defendants owed a duty to exercise reasonable care in the operation of their facilities, including in their emission of EtO, to prevent harm to neighboring Plaintiff. It was reasonably foreseeable that neighboring persons would be exposed to elevated levels of Defendants' EtO emissions, and would face the health risks associated with EtO exposure.

85.     Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

    a.     Emitting dangerous volumes of EtO into the air;

    b.     Disregarding safe methods to adequately control EtO emissions;

    c.     Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

    d.     Failing to adequately record test results of high levels of EtO;

    e.     Ignoring test results of high levels of EtO;

    f.     Underreporting EtO levels; and

    g.     Subjecting those who live and work near their facilities to an elevated cancer risk.

86.     As a proximate result of one of the aforesaid negligent acts or omissions, Plaintiff Russell Cichy suffered injuries of a personal and pecuniary nature.

FILED DATE: 5/8/2024 7:06 PM   2024L005112

WHEREFORE Plaintiff Russell Cichy demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II
### Willful and Wanton Conduct
### (On Behalf of Plaintiff and Against Defendants)

87.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

88.     At all times relevant, Defendants owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of the Plaintiff and those living and working in the area surrounding their facilities.

89.     Notwithstanding their duties, Defendants breached their duties in one or more of the following ways:

   a.     Emitting dangerous volumes of EtO into the air;

   b.     Disregarding safe methods to adequately control EtO emissions;

   c.     Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

   d.     Failing to adequately record test results of high levels of EtO;

   e.     Ignoring test results of high levels of EtO;

   f.     Underreporting EtO levels; and

   g.     Subjecting those who live and work nearby their facilities to an elevated cancer risk.

90.     As a proximate result of one of the aforesaid willful and wanton acts or omissions, Plaintiff Russell Cichy suffered injuries of a personal and pecuniary nature.

FILED DATE: 5/8/2024 7:06 PM  2024L005112

WHEREFORE Plaintiff Russell Cichy demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

### COUNT III
**Public Nuisance**
**(On Behalf of Plaintiff and Against Defendants)**

91.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

92.     At all relevant times, Defendants have known EtO to be hazardous and harmful to humans.

93.     The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

94.     Defendants' use and emission of EtO from their facilities substantially and unreasonably infringes upon and/or transgresses this public right.

95.     Defendants knew and should have known that the EtO they emitted would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons inhaling it, including people living and working in the community.

FILED DATE: 5/8/2024 7:06 PM   2024L005112

96.     Defendants' operation, maintenance, and use of their facilities caused those who live and work in the area surrounding their facilities to breathe air containing high levels of EtO on a routine basis, causing a substantially elevated risk of cancer.

97.     As a proximate result, Plaintiff's and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

98.     As a proximate result, EtO invaded and caused to be contaminated the areas immediately surrounding and on Plaintiff's residence and work.

99.     As a proximate result, Plaintiff was exposed to and inhaled significant quantities of EtO.

100.    As a proximate result, Plaintiff sustained and will continue to sustain severe and permanent damage to his health due to the emission of EtO.

101.    As a proximate result, Plaintiff Russell Cichy suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Russell Cichy demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IV
### Ultrahazardous Activity/Strict Liability
### (On Behalf of Plaintiff and Against Defendants)

102.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

103.    Defendants' use and emission of EtO from their facilities constitutes an ultra-hazardous activity.

FILED DATE: 5/8/2024 7:06 PM    2024L005112

104.    Defendants' use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. As EtO is carcinogenic, exposure to it at any level is inherently dangerous, and Defendants emitted tons of it into the air around their properties.

105.    Defendants' use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which their facilities are located. Medical device sterilization is not an activity regularly undertaken by individuals in the population.

106.    The activities conducted by Defendants are exceedingly dangerous as described herein and, as compared to competing sterilization technologies and/or as compared to locating the facilities in less-populated areas, offer little to no value to the surrounding community.

107.    Because the activities of Defendants are ultrahazardous, Defendants are strictly liable for any injuries proximately resulting therefrom.

108.    As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff was exposed to and inhaled significant quantities of EtO.

109.    As a proximate result of Plaintiff's inhalation of EtO from the Defendants' facilities, Plaintiff Russell Cichy suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Russell Cichy demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

Respectfully submitted,

**RUSSELL CICHY,**

Date: May 8, 2024                    By: /s/ Brandt Silver-Korn
                                     One of Plaintiff's Attorneys

FILED DATE: 5/8/2024 7:06 PM    2024L005112

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Amy Hausmann
abhausmann@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6370
Firm ID: 62075

Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn
bsilverkorn@edelson.com
Lauren Blazing*
lblazing@edelson.com
EDELSON PC
150 California St, 18th Floor,
San Francisco, CA 94111
415.212.9300

*Admitted Pro Hac Vice into consolidated
lead action